# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case Nos. 2021-0349 and 2021-0356, <u>Christ Redeemer Church v. Town of Hanover; Jeff Acker & a. v. Town of Hanover</u>, the court on April 14, 2023, issued the following order:**

The court has reviewed the written arguments and the record submitted on appeal, has considered the oral arguments of the parties, and has determined to resolve these consolidated cases by way of this order.  <u>See</u> <u>Sup. Ct. R.</u> 20(2).  Plaintiff Christ Redeemer Church (CRC) and plaintiffs Jeff and Lara Acker (the Ackers) each appeal an order of the Superior Court (<u>Bornstein</u>, J.) upholding the decision of Town of Hanover's (Town) Zoning Board of Adjustment (ZBA) granting CRC a use special exception, subject to certain conditions, and a wetlands special exception to construct a church.  We affirm in part and reverse in part.

I.  <u>Background</u>

The following facts are supported by the record.  CRC has operated within the Town for nearly twenty years, renting space at Hanover High School to conduct religious services.  After more than ten years of searching for property to purchase in Hanover, CRC acquired a series of lots on Greensboro Road.  Greensboro Road is a two-lane road with a posted speed limit of 30 miles per hour, which sees "approximately 3,100 traveling vehicles per day."

In 2018, CRC applied to the ZBA for special exceptions to build a 21,250 square foot church on two merged lots, along with a driveway and parking lot.  CRC proposed constructing a church capable of holding up to 415 people, a parking lot for 120 vehicles, and related infrastructure.  One-third of the proposed project, including the entire footprint of the church building and approximately 40 parking spaces, was to be located in the Town's Single Residence (SR) district.  The remaining two-thirds, including the additional parking spaces and related infrastructure, were to be located in the Town's Rural Residence (RR) district.  CRC's proposal required a use special exception, as churches are permitted in the SR and RR districts only by special exception. <u>Hanover, N.H., Zoning Ordinance</u> (hereinafter, <u>Ordinance</u>) §§ 405.8, 405.9.  CRC's proposal also required a wetlands special exception for the wetland buffer zone along the northwest portion of the property.  <u>See</u> <u>Ordinance</u> § 1103.7.

In support of its application, CRC submitted a traffic study, a sound level assessment, and a property value assessment.  In addition, both CRC and the

Ackers hired experts and submitted engineering reports. The ZBA also hired an independent expert "for a third party technical review of the presentations submitted in support of and opposition to the application relating to water resource impacts."

Between June and October 2018, the ZBA held five public hearings on CRC's application. The Ackers, who own property on the opposite side of Greensboro Road from the proposed church, participated throughout the proceedings, submitting letters and public comment. After holding deliberations in November and December 2018, the ZBA granted CRC's wetlands special exception and denied the use special exception application. The Ackers moved for rehearing, which the ZBA denied. CRC also moved for rehearing on the use special exception, which the ZBA granted.

Upon rehearing in March 2019, the ZBA granted CRC a use special exception, subject to a number of conditions. The conditions included: (1) a maximum occupancy on the premises of 300 persons and seating for no more than 300 persons in the sanctuary; (2) a limit on the hours of operation and occupancy from 7:00 a.m. to 9:00 p.m. on weekdays and 8:00 a.m. to 9:00 p.m. on weekends; (3) a limit of 113 parking spaces and a requirement that CRC utilize a traffic coordinator; (4) a requirement that the sanctuary windows "remain closed during all activities except in case of emergency or failure of the HVAC system"; and (5) the installation of a noise mitigation screen around the mechanical equipment. CRC and the Ackers each filed motions for rehearing, which the ZBA denied.

Both CRC and the Ackers brought suit against the Town in superior court. The Ackers filed two separate appeals pursuant to RSA 677:4 (2016) — one regarding the use special exception and the other the wetlands special exception. CRC filed a nine-count complaint. Counts I through VIII raised challenges to the Town's ordinance under the "First Amendment," "Equal Protection," and "Substantive Due Process," and challenged the special use conditions under the Federal Religious Land Use and Institutionalized Persons Act (RLUIPA). See 42 U.S.C. § 2000cc (2000). Count IX challenged, pursuant to 677:4, the ZBA's imposition of the occupancy, hours of operation, and window closure conditions on the use special exception.

CRC moved for summary judgment on Counts I through VI of its complaint and the Town moved for summary judgment on Counts I through VIII of CRC's complaint. Following a hearing, the trial court issued an order on the summary judgment motions and on the merits of the ZBA appeals. The court granted the Town's motion for summary judgment on CRC's constitutional claims. With respect to CRC's RLUIPA claim, the trial court denied CRC's motion for summary judgment except as to the window closure condition and otherwise granted the Town's motion. With respect to the ZBA appeals under RSA 677:4, the court affirmed the ZBA's decision to grant the

use special exception except with respect to the window closure condition and affirmed the ZBA's decision to grant the wetlands special exception. Following a separate hearing on CRC's claims for damages, costs, and attorney's fees, the trial court awarded CRC nominal damages in the amount of one dollar and court costs in the amount of $280.00, but denied its request for attorney's fees. The trial court subsequently denied CRC's motion for reconsideration of its order addressing the summary judgment motions and the merits of the ZBA appeals. This appeal followed.

II. <u>Analysis</u>

On appeal, CRC argues that the trial court erred by: (1) not ruling that the ordinance is unconstitutional "under the First Amendment and Part I, Article 5 of the New Hampshire Constitution"; (2) not ruling that the special exception requirement in the ordinance is an "unconstitutional prior restraint"; (3) not ruling that the ordinance violates "constitutional equal protection"; (4) not ruling that the Town violated RLUIPA; (5) not vacating the occupancy and hours conditions under RSA chapter 677; and (6) not granting a builder's remedy and attorney's fees, and awarding only one dollar in damages.

The Ackers argue that the trial court erred by determining that: (1) the ZBA's decision to grant a use special exception on rehearing was not unlawful or unreasonable; (2) the record contained sufficient evidence to support the adequacy of the conditions imposed by the ZBA; (3) the ordinance only requires review of the runoff from portions of the project that are in a wetland or wetland buffer; (4) the record contained sufficient evidence to support the ZBA's grant of the wetland special exception; and (5) the record supported the ZBA's "creation of a de minimis exception to the prohibition against any increased stormwater runoff" in the ordinance.

Although CRC raises several constitutional claims, because we generally decide constitutional questions only when necessary, we first address the parties' arguments under RSA chapter 677. <u>See</u> <u>State v. Fogg</u>, 170 N.H. 234, 236 (2017). Our review in zoning cases is limited. <u>Dietz v. Town of Tuftonboro</u>, 171 N.H. 614, 618 (2019). "The party seeking to set aside the ZBA's decision bears the burden of proof on appeal to the trial court." <u>Id</u>. (quotation omitted). "The factual findings of the ZBA are deemed <u>prima</u> <u>facie</u> lawful and reasonable, and will not be set aside by the trial court absent errors of law, unless the court is persuaded, based upon a balance of probabilities, on the evidence before it, that the ZBA's decision is unreasonable." <u>Id</u>. (quotation omitted). "The trial court's review is not to determine whether it agrees with the zoning board of adjustment's findings, but to determine whether there is evidence upon which they could have been reasonably based." <u>Id</u>. (quotation omitted). "The trial court reviews the ZBA's statutory interpretation <u>de novo</u>." <u>Id</u>.

3

"We will uphold the trial court's decision on appeal unless it is not supported by the evidence or is legally erroneous." Id. (quotation omitted). "We review the trial court's statutory interpretation de novo." Id. (quotation omitted).

A

CRC first argues that the trial court erred in upholding the ZBA's limitation on the hours of operation and occupancy because its ruling was unsupported by the evidence and therefore unlawful and unreasonable under RSA 677:6 (2016). CRC does not challenge the parking condition or noise mitigation screen condition on appeal, nor has the Town challenged the trial court's reversal of the window closure condition.

Before addressing the merits of CRC's argument, we note that the Ackers assert that the trial court "committed reversible error in upholding the ZBA's post-rehearing decision where the record demonstrated that there was no error in the ZBA's prior denial and no new evidence was submitted." Under RSA 677:2, a zoning board of adjustment may grant a rehearing "if in its opinion good reason therefor is stated in the motion" for rehearing. RSA 677:2 (2016) (emphasis added). The record shows that the ZBA identified several arguments raised in CRC's motion for rehearing as the basis for granting the motion. Therefore, the trial court did not commit reversible error by focusing its review on the merits of the ZBA's post-rehearing decision.

Turning to CRC's arguments, the ordinance provides that "[i]n addition to the general and specific standards established by this Ordinance, the Zoning Board of Adjustment shall impose upon the approval of a special exception such additional conditions as it finds reasonably appropriate to safeguard the neighborhood or otherwise serve the purposes of the Ordinance." Ordinance § 207.4. The list of possible conditions includes "restrictions of the method of operation, the time of operation and use, and the size or extent of facilities," as well as limits on occupancy. Id.

Regarding the hours of operation condition, the trial court concluded that "[t]he Board did not consider only the personal opinions of its members but a combination of their personal observations and objective facts." We disagree. As part of the findings of fact in its decision on rehearing, the ZBA noted that CRC holds "6:00 to 7:00 AM and 9:00 to 10:30 AM Bible Study Groups on Tuesday" and "a First Friday Men's Breakfast at 6:00 to 7:00 AM." However, as justification for setting an hours of operation limitation, which includes a limit of 7:00 a.m. to 9:00 p.m. on weekdays, the ZBA stated: "We will limit the hours of operation in order to reduce noise, light, traffic and commotion during nighttime and early morning hours. We have chosen hours that are consistent with our observations of the hours during which most activities take place at area churches."

4

There is, however, no evidence in the record specifically delineating the effects of using the church at 6:00 a.m. on weekdays as opposed to 7:00 a.m. Rather, both the traffic and noise studies submitted by CRC concluded that even at peak traffic hours and maximum noise levels, CRC's proposed church would not result in a detrimental impact. Moreover, although the ZBA stated it would limit the hours of operation due to noise, light, and traffic concerns, it instead chose hours based on observations of activities at area churches. There is no evidence that the area churches relied on by the ZBA experience similar noise, light, and traffic concerns as CRC's proposed church would on Greensboro Road. While board members "may base their conclusions upon their own knowledge, experience, and observations," Dietz, 171 N.H. at 624 (quotation omitted), their decision must be supported by evidence in the record. Because the hours of operation condition is unsupported by the evidence in the record, we conclude that the imposition of this condition is unreasonable under RSA 677:6. Therefore, we reverse the trial court's decision upholding the imposition of the hours of operation condition.

CRC further argues that the trial court's decision to uphold the occupancy condition "was neither logical nor supported by the evidence." The trial court reasoned that "[t]he 300-person occupancy condition makes logical sense, considering that CRC's traffic study indicated that the average Sunday service attendance was 300 persons." The trial court therefore concluded that "the Board's determination of 2.9 people per vehicle and the 300-person limit based on that number multiplied by 113 was not an unreasonable determination, even if another finder of fact might have applied a different methodology." We disagree.

As noted by the trial court, the ZBA's decision to impose a 300-person occupancy limit was rooted in the ZBA's reasoning as to how many parking spaces would be permitted. The ZBA explained that "[a]t the rehearing, applicant offered a condition that only 104 vehicles would be allowed to park on the property." The ZBA settled on a condition permitting 113 parking spaces on the property, which "leaves nine spaces for staff" and "should preclude the possibility of cars parking in the wetland buffer." The ZBA noted that CRC "also offered that if attendance exceeds the lot capacity, shuttle buses will be used to ferry remaining attendees to the church." However, the ZBA found that "potential problems from the limited capacity of the parking lot will be considerably worse at an average attendance of 400." Thus, the ZBA reasoned, "[w]e see no better measure to establish this limit, than to adopt one suggested by the applicant in its presentation to us, which is a limit of 300 persons implied by the traffic study."

Yet, the record shows that CRC hoped to utilize the church's 415-person maximum capacity, envisioning an average weekly attendance of "over 400" people in the coming years. Basing the occupancy condition exclusively on the number of parking spaces does not account for people arriving at the church

5

by any other mode of transport, even though the building itself has the capacity to accommodate them. The ZBA reasoned that "[i]f occupancy per vehicle is lower, or if attendance were even greater than 300, some alternative transportation arrangement like shuttle [buses] will be required." This conclusion does not consider the possibility that occupancy per vehicle may be higher or that people may, for example, walk or cycle to the church. The record contains numerous letters from Hanover residents describing how people often walk, jog, and cycle on Greensboro Road. Based on the evidence in the record, we conclude that failing to account for these possibilities is unreasonable under RSA 677:6.

Additionally, the ZBA repeatedly expressed its skepticism as to CRC's traffic study absent evidence that it was inaccurate. The ZBA explained that the traffic study "results in an average of 2.9 persons per vehicle at the current typical CRC attendance of 300 on Sundays, an average which some Board members consider to be optimistic relative to our experience of church traffic in the area." However, this number was not specifically included in the traffic study; rather, it was an "implied estimate" that the ZBA gleaned from the traffic study's results. Despite acknowledging that "we have no facts to prove that it is high," the ZBA reasoned that if the estimate is indeed high, then the number of shuttle buses required would increase and could cause greater traffic issues. Basing the occupancy condition in part on this unsupported skepticism is unreasonable.

Moreover, the ZBA did not provide any justification for departing from the ordinance in these calculations. The ordinance provides that "places of worship" are to be allotted a minimum number of off-street parking spaces in the amount of "1 for each 10 seats in D, GR-2 and I districts; 1 for each 5 seats in all other districts." Ordinance § 1002.1. Because the proposed church is to be located in the SR district, a parking lot of 113 spaces would result in an occupancy of 565 people. In light of this number, the ZBA's failure to explain why all 415 seats could not be utilized is unreasonable. Accordingly, we reverse the trial court's decision upholding the ZBA's imposition of the occupancy condition on CRC.

We have reviewed CRC's additional arguments — including that the ordinance is unconstitutional, the Town violated RLUIPA, and the trial court erred in denying its request for attorney's fees, a builder's remedy, and additional damages — and determine that they do not warrant further discussion. See Vogel v. Vogel, 137 N.H. 321, 322 (1993).

B

The Ackers challenge the ZBA's grant of the wetlands exception, arguing that the ZBA erred in interpreting the ordinance and relied on insufficient evidence.

6

The ZBA found that CRC's proposal initially required a special exception for the wetland buffer on the northwest portion of CRC's property. There are "substantial wetlands" to the north and west of CRC's proposed project and though "the project does not impinge on those water resources," it does "invade the 75 foot wetland setback from those water resources." The proposed parking lot, particularly the two-lane driveway and the most extreme point of the parking lot, would impact 16,495 square feet of the wetland buffer zone.

CRC's expert, Audra Klumb, identified an additional wetland: Wetland E, an 850 square foot man-made wetland caused by pipe drainage. The Ackers' expert, Rick Van de Poll, also identified Wetland E but subsequently identified another 1,950 square foot wetland, Wetland Z, to the north of Wetland E that was, in his opinion, "hydrologically connected" to Wetland E. He concluded that Wetlands E and Z comprised a single wetland of approximately 2,770 square feet in area. Klumb revisited the property and also located Wetland Z, but found that Wetland Z was only 850 square feet in area and that there was "no immediate connectivity between Wetland Z and Wetland E."

Van de Poll also found that most of CRC's proposed project's stormwater runoff would be directed into Wetland E and flow under Greensboro Road through a culvert and onto the Ackers' property. On the issue of stormwater runoff, CRC retained another expert — Otter Creek — as did the Ackers — Ann Kynor of Pathways Consulting — to compile reports and provide testimony.

The ZBA then consulted an expert of its own, Steven Keach, who submitted a report and provided testimony at the ZBA's October 2018 meeting. In part, Keach testified about whether CRC's proposal satisfied Section 1103.7(A)(5)(a) of the ordinance, which provides that "[t]he proposed activity will not increase the peak run off rate of surface water from 2-, 10-, 25-year 24 hour storms into any wetland or waterbody wherever located." Ordinance § 1103.7(A)(5)(a). During deliberations, the ZBA members discussed Keach's report and testimony, noting that Keach opined that the driveway, as it was currently graded, did not funnel most of the project's stormwater runoff into Wetland E — in other words, that it did not increase the peak runoff rate — but that he was concerned that in the future the driveway may be graded in such a way as to cause a runoff issue.

In its decision granting the wetlands special exception, the ZBA reasoned that Section 1103 "addresses the effect of the invasion by a project on wetlands and their buffers, not the water flow or erosion effects created by other elements of a project." The ZBA explained that "Section 1103.2A, the operative prohibition, requires permission only for activities 'within a waterbody or wetland, vernal pool, or intermittent stream or in the buffer area around those features" and that "[t]he special exception standards in Section 1103.7 apply in the case of activities 'otherwise restricted under Section 1103.2.'" The ZBA noted that it is "confident that storm water concerns raised by the opponents of

7

the church project will receive full consideration in proceedings still to come before the Planning Board and the New Hampshire Department of Environmental Services." The ZBA then "turn[ed] to the water resource impacts within our jurisdiction which are those resulting from the buffer invasions proposed by Applicant."

Regarding the proposed parking lot, the ZBA determined that in order to comply with the ordinance, five parking spaces needed to be eliminated from CRC's proposal. See Ordinance § 1103.7(A)(2). Regarding the driveway, which would involve "a wetland buffer invasion of approximately 16,000 square feet," the ZBA explained that Keach testified that "run off from that portion of the project on the new driveway in the buffer will be diverted away from the wetland into the property and the Applicant's proposed arrangement will not increase peak surface run off rates of water from the buffer." The ZBA "accept[ed] Mr. Keach's expert advice on this topic." With respect to Wetlands E and Z, the ZBA stated that "[t]he Ordinance does not regulate activity in wetlands that are less than 1000 square feet in size."

The trial court agreed with the ZBA's interpretation of the ordinance, concluding that "the Board may review only 'activity' in wetlands and wetland buffers and not projects as a whole." The court determined that "[u]nder the plain terms of this provision, any 'activity' that falls outside of a wetland or wetland buffer is unaffected by the wetlands provisions of the Ordinance." The trial court also found that there was evidence upon which the ZBA could have reasonably based its grant of the wetlands special exception.

On appeal, the Ackers challenge both the ZBA's interpretation of the ordinance as well as the sufficiency of the evidence supporting the grant of the special exception. We turn first to the interpretation of the ordinance.

The interpretation of a zoning ordinance is a question of law, which we review de novo. Town of Lincoln v. Chenard, 174 N.H. 762, 765 (2022). Because the traditional rules of statutory construction govern our review, we construe the words and phrases of an ordinance according to the common and approved usage of the language. Id. We determine the meaning of a zoning ordinance from its construction as a whole, not by construing isolated words or phrases. Id.

The Ackers first argue that the ZBA and the trial court "erroneously interpreted Section 1103.7(A)(5)(a) to only require review of stormwater generated from project activities occurring exclusively within a water resource and flowing into wetlands greater than 1,000 square feet or their associated buffers." The Town contends that "[t]he trial court's decision properly construes the Ordinance as a whole, and the Ackers' interpretation is misplaced."

Section 1103.2(A) of the ordinance provides that "no person may engage in activity, as defined in Section 1101, within a waterbody or wetland, vernal pool, or intermittent stream or in the buffer area around those features as defined in Article XI, unless explicitly permitted pursuant to this section." "Activity" is defined in Section 1101 as "[a]ny undertaking that would potentially change the quality or flow pattern of water to, from, or in a water resource, either on or below the surface." "Wetland" is defined in Section 1101 as "[a]ny area that is inundated or saturated by surface or ground water at a frequency and duration to support, and that under normal conditions does support, a prevalence of vegetation typically adapted for life in saturated soil conditions." An exception to Section 1103.2 permits "[a]n activity within a wetland or intermittent stream or a buffer of a wetland in cases in which the wetland or intermittent stream comprises, in the aggregate, less than 1000 square feet." Ordinance § 1103.4(B).

Section 1103.7(A) provides that "[a]ctivities otherwise restricted under Section 1103.2 and not permitted under Subsections 1103.4, 1103.5 or 1103.6 may be permitted only if the Zoning Board of Adjustment finds that the proposal conforms to the standards set forth in this Subsection 1103.7." Under Section 1103.7(A)(5)(a), the ZBA must find that "[t]he proposed activity will not increase the peak run off rate of surface water from 2-, 10-, 25-year 24 hour storms into any wetland or waterbody wherever located."

The plain language of the ordinance supports the ZBA's and the trial court's interpretation that "the Board may review only 'activity' in wetlands and wetland buffers and not projects as a whole." To interpret the ordinance otherwise would read out Section 1103.2(A)'s specific restriction on activity "within" a wetland. See Chenard, 174 N.H. at 765 ("We give effect to every word of a statute whenever possible and will not consider what the legislature might have said or add language that the legislature did not see fit to include."). Thus, we disagree with the Ackers that the ZBA and the trial court "conflated Section 1103's trigger for jurisdiction – activity within a wetland or wetland buffer – to mean that the term 'activity,' whenever used in Section 1103.7(A), must only refer to the portion of the activity within the buffer."

However, we agree with the Ackers that the ZBA and the trial court "erroneously concluded that because activities in wetlands that are less than 1,000 square feet, or their associated buffers, do not require a special exception pursuant to Section 1103.4, all activity that results in a discharge to a wetland of less than 1,000 square feet is outside the scope of review under 1103.7(A)(5)." The ordinance does permit activity that occurs within a wetland or wetland buffer that is less than 1,000 square feet. Ordinance § 1103.4(B). However, to the extent activity occurs in a wetland buffer greater than 1,000 square feet, as in the case of CRC's proposal, the activity must not increase the peak runoff rate of stormwater "into any wetland or waterbody wherever located." Ordinance § 1103.7(A)(5)(a) (emphasis added). Unlike Section

9

1103.4(B), Section 1103.7(A)(5)(a) does not include a limit on the size of the wetland. Thus, to the extent that CRC's proposed driveway may increase the peak runoff rate of stormwater in Wetlands E or Z, the ZBA should have considered any increase under Section 1103.7(A)(5)(a).

This error, however, did not undermine the ZBA's overall analysis. While the ZBA did not expressly consider the peak runoff rate as it specifically flowed into the smaller wetlands, the ZBA did assess the driveway's impact and compliance with Section 1103.7(A)(5)(a). The ZBA specifically acknowledged that "[t]here is some controversy reflected in the record about the adequacy of Applicant's storm water design to handle the increase in peak run off rates from the project site caused by the entire project." The ZBA explained that Keach testified that CRC's proposed new driveway would not increase peak surface runoff rates of water from the buffer. Based on this evidence, the ZBA determined that CRC's proposal met the standard set forth in Section 1103.7(A)(5)(a).

The Ackers challenge the sufficiency of this evidence, arguing that neither Otter Creek's analysis nor the analysis of the Ackers' own expert "broke out the run off rates for the portions of the Project driveway in the buffer." We fail to see, however, how an over-inclusive analysis of the stormwater runoff from the entire project, which yielded no increase according to Otter Creek and Keach, would not also encompass a more narrow determination.

In addition, the Ackers argue that "[i]t was error for the Superior Court and the ZBA to create a de minimis exception to the requirement in Section 1103.7(A)(5) of no increase in peak runoff rates." The Ackers assert that Otter Creek's calculations of runoff rates are flawed, and that "[w]hen corrected, Otter Creek's own analysis shows about a 0.58 [cubic feet per second] increase in stormwater runoff between pre and post development." According to the Ackers, when Keach was "confronted with this actual increase in peak runoff caused by the Project" during his testimony to the ZBA, he responded that if there was an increase, it was "de minimis."

However, this passing remark did not undermine Keach's specific findings that "[i]n each instance the applicant's consultant reports post-development peak discharge volumes at Design Points 1 and 2 nominally lower than those realized under pre-development conditions," thereby, in his expert opinion, meeting the standard of Section 1103.7(A)(5)(a). In his report, Keach explained that "[i]n our view the quantification of stormwater runoff is not an exact science" and "we believe it is important to recognize that results of independent analysis provided by two or more equally qualified professionals are likely to vary to some extent." The ZBA has the discretion "to resolve conflicts in evidence and assess the credibility of the offers of proof." Harborside Assocs. v. Parade Residence Hotel, 162 N.H. 508, 519 (2011).

Therefore, the trial court did not err in concluding that there was evidence upon which the ZBA could have reasonably based its decision to grant the wetlands special exception.  See Dietz, 171 N.H. at 618.  Accordingly, we affirm the trial court's decision with respect to the wetlands special exception.

C

In sum, we reverse the trial court's decision upholding the hours of operation and occupancy conditions and affirm the trial court's decision rejecting CRC's arguments that the ordinance is unconstitutional, that the Town violated RLUIPA, and that CRC should be awarded attorney's fees, a builder's remedy, and additional damages.  We also affirm the trial court's decision to uphold the ZBA's grant of the wetlands special exception.

<u>Affirmed in part and reversed in part</u>.

MACDONALD, C.J., and HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.

**Timothy A. Gudas,
Clerk**